UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BROOKE N. TAFLINGER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CAUSE NO. 1:09-cv-0771-WTL-DML |
| | ) |
| BRIAN HINDSON, CENTRAL INDIANA | ) |
| AQUATICS, UNITED STATES SWIMMING, | ) |
| INC., and WESTFIELD-WASHINGTON | ) |
| SCHOOL CORPORATION, | ) |
| | ) |
| Defendants. | ) |

**DEFENDANT UNITED STATES SWIMMING, INC.'S
BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant United States Swimming, Inc. ("USA Swimming") respectfully submits its

Brief in Support of its Motion for Summary Judgment against Plaintiff Brooke N. Taflinger

("Plaintiff") in accordance with Fed. R. Civ. P. 56.

Plaintiff brought her lawsuit following an unforeseen criminal act by Defendant Brian

Hindson ("Hindson"), Plaintiff's former swim coach, when he secretly videotaped Plaintiff

changing in the coach's locker room one time at Westfield High School.[1]  A couple things are

certain:  nobody knew Hindson was doing the videotaping, Plaintiff admits there was nothing

that anybody could have done to prevent him from secretly videotaping (Taflinger Dep. pp.

207:25-208:1-4)[2], and USA Swimming is not liable for Hindson's criminal conduct.  Two

critical points to remember: no one is accused of touching the Plaintiff and Hindson never

disseminated Plaintiff's image on the Internet or anywhere else.  (Brian Hindson Affidavit II,

---

[1] There are absolutely no allegations that Brian Hindson ever physically touched any swimmer.
[2] All references in the citations to exhibits, affidavits, depositions, etc. are attached to USA Swimming's separately
filed Designation of Evidence.

June 1, 2010, ¶ 2).  Clearly, the liability and responsibility for Hindson's reprehensible and unforeseen criminal conduct lies with Hindson and no one else – including USA Swimming.

There are five (5) remaining counts against USA Swimming:  Count 9-Invasion of Privacy: Public Disclosure of Private Facts; Count 10-Invasion of Privacy: By Physical Intrusion; Count 11-Negligent Supervision; Count 14-Breach of Duty Based on a Special Relationship of Mutual Benefit Between Plaintiff and USA Swimming; and Count 16-Breach of Contract Between USA Swimming and Plaintiff.[3]  USA Swimming seeks Summary Judgment as a matter of law based upon the undisputed facts for each of these counts.

As to Count 9, invasion of privacy by public disclosure of private facts, Indiana does not recognize such a claim and even if it did there is no evidence that USA Swimming videotaped Plaintiff.   With regard to Count 10, invasion of privacy-intrusion by seclusion, Summary Judgment is appropriate because USA Swimming did not videotape Plaintiff nor did it physically intrude on her private space.   Concerning Count 11, a claim for negligent supervision, there is absolutely no evidence that USA Swimming employed or hired Hindson.   Count 14 should be dismissed because Indiana law does not recognize a claim for a "duty based upon special relationship of mutual benefit" and the undisputed evidence shows USA Swimming and Plaintiff were not in a special relationship creating a legal duty.   As for Count 16, breach of contract, Plaintiff has failed to identify a contract and more specifically she has not identified one that would cover Hindson's criminal conduct.   Furthermore, if Plaintiff is relying on her voluntary membership as the contract, then it is clear under Indiana law that the Courts are not to interfere with or second guess USA Swimming's interpretation or enforcement of its own rules and regulations.   Lastly, Plaintiff's claims under Counts 11 and 14 are not sustainable and do not

---

[3] On December 7, 2009, the Court dismissed Plaintiff's claims for intentional infliction of emotional distress (Count 7) and for negligent infliction of emotional distress (Count 8).

survive Summary Judgment because USA Swimming did not proximately cause Plaintiff to be secretly videotaped by Hindson.

I.      **STATEMENT OF UNDISPUTED MATERIAL FACTS[4]**

**USA Swimming - The National Governing Body of the Sport of Swimming**

United States Swimming, Inc., which does business under the trade name of USA Swimming, is a Colorado non-profit 501(c)(3) corporation governed by a Board of Directors elected by various constituency groups of the membership.  Charles Wielgus Dep. pp. 14:25-15:4-5; 15:17-19; 16:15-21.  Within the International Olympic Committee there are National Olympic Committees, such as, the US Olympic Committee.  Affidavit of Charles Wielgus, ¶ 9.  Each National Olympic Committee has a National Governing Board for each Olympic sport.  *Id.*  USA Swimming was formed in 1978 with the passage of the Amateur Sports Act ("Act") which specified that all Olympic sports would be administered independently.  *Id.* at ¶ 6.  The Act created the modern U.S. Olympic Committee and the national governing bodies that oversee Olympic sports in the U.S. Wielgus Dep. p. 15:6-8.  USA Swimming is one of the forty-four national governing bodies ("NGB") in the U.S. with each representing a different Olympic sport.  Wielgus Dep. pp. 17:21-18:15.  As the NGB for swimming, USA Swimming administers competitive swimming for its members in accordance with the Act.  Wielgus Aff., ¶ 10.  USA Swimming provides programs and services for its members, supporters, affiliates and the interested public.  *Id.* at ¶ 10.

One of the main functions of USA Swimming, as the NGB of the sport of swimming, is "to provide fair and equitable conditions of competition and [to] promote uniformity in the sport so that no swimmer shall obtain unfair advantage over another."  Wielgus Aff., Ex. A, 2000 USA

---

[4] USA Swimming asserts that the facts stated are undisputed for purposes of summary judgment only.  USA Swimming reserves the right to dispute or contest any of the listed facts and evidence in any other part of this proceeding.

Swimming Rules and Regulations, p. 15.  USA Swimming's objectives are to build the base and promote the sport of swimming and to achieve success at the international level in competition. Wielgus Dep. p. 101:1-5.

Within the United States, there are fifty-nine (59) Local Swimming Committees ("LSC") for USA Swimming including Indiana Swimming, Inc.  Wielgus Aff., ¶ 11.  Each LSC is responsible for administering USA Swimming activities in a defined geographical area and has its own set of bylaws under which it operates.  *Id*. at ¶ 11.  A House of Delegates with representation of athletes, coaches, members of the Board of Directors and clubs is responsible for managing the business affairs of the LSC.  *Id*. at ¶ 11.  In Indiana, Club members of USA Swimming belong to Indiana Swimming, Inc. headquartered in Indianapolis, Indiana.  *Id*. at ¶ 12. There are approximately 350,000 members of USA Swimming today.  *Id*. at 13.  During 1999-2000 there were approximately 286,000 members.  *Id*.  There are approximately 11,000 Coach members of USA Swimming today.  *Id*. at ¶ 14.  There were approximately 9,000 Coach members in 1999-2000.  *Id*.

USA Swimming is "the governing body that puts the laws and regulations and time qualifications [in place] and makes sure that everything is legal for the athletes and for the coaches in order to represent the United States at the Olympics."  Taflinger Dep. p. 47:12-17. One of the purposes of USA Swimming sanctioned events is to make sure the officials are watching, to make sure strokes are done correctly.  Taflinger Dep. p. 48:5-17.  Plaintiff explained that USA Swimming is a voluntary association and one that she did not have to join.  Taflinger Dep. p. 93:1-3.  As for the swim clubs, Plaintiff describes those as community-based, but affiliated with USA Swimming, in that, club swimmers had to pay dues and be a member of USA Swimming to participate in the club and in U.S. sanctioned meets and competitions.

Taflinger Dep. p. 11:15-19.  The last year that Plaintiff was a member of USA Swimming was 2004.  Taflinger Dep. p. 49:8-10.  Plaintiff could not identify signing any contract with USA Swimming.  Taflinger Dep. p. 79:15-20.  Fishers Area Tigers Swim Coach Kenneth Stopkotte confirmed that he is unaware of a written contract between his club swimmers and USA Swimming.  Stopkotte Dep. pp. 67:24-25-68:1.  According to Hindson, "none of [his] club swimmers ever had a 'contract' with USA Swimming."  Hindson Aff. II ¶ 12.

USA Swimming enacted certain rules and regulations designed to promote the excellence of the athletes; the orderly running of meets; and the maintenance of national records.  Wielgus Aff. ¶ 7.  These Rules and Regulations were not intended to control day-to-day swim practices and work-outs but rather to conduct swimming meets.  *Id*. at ¶ 7.

The 2000 USA Swimming Rules & Regulations begin with the cautionary statement that:

> **It is not the purpose of the Rules and Regulations of USA Swimming (that national governing body) contained herein to set standards of care for the safety of the swimmer.  Safety considerations should be addressed by the swimmer, swim coach, the swim club and the local public entity or pool owner where events are held.**

Wielgus Aff., Ex. A, 2000 USA Swimming Rules and Regulations, p. 15 (bolded emphasis in original).  Annual membership in USA Swimming is for a calendar year period.  *Id*. at p. 90.

The Rules and Regulations contain a Code of Conduct.  The Code of Conduct was enacted in 1999.  Wielgus Dep. p. 167:15-22.  USA Swimming was one of the first NGBs to adopt a code of conduct.  Wielgus Dep. p. 19:3-6.  The Code of Conduct enumerates behavior that affects the privilege of USA Swimming.  Wielgus Aff., Ex. A., pp. 92-94.  The Code of Conduct is centered on:

> [t]he mission of USA Swimming to encourage participation and the pursuit of excellence in all aspects of swimming.  USA Swimming grants the privilege of membership to individuals and organizations committed to that mission.  The privilege of membership may, therefore, be withdrawn or denied by USA

Swimming at any time where USA Swimming determines that a member or prospective member's conduct is inconsistent with the mission of the organization or the best interest of the sport and those who participate in it.

In order to assist all members to better serve the interests of those who participate in swimming, USA Swimming has adopted this Code of Conduct.

*Id*. at pp. 92-93 (emphasis added). The Rules and Regulations also provide for hearings and an

appeals process with respect to the membership privileges. *Id*. at pp. 95-99.

As a voluntary membership organization, where membership is a privilege and not a

right, USA Swimming may:

censure, place on probation, suspend for a definite or indefinite period of time with or without terms of probation, fine, or expel any member of USA Swimming, including any athlete, coach, manager, official, and member of any committee, or any person participating in any capacity whatsoever in the affairs of USA Swimming who has violated any of its rules or regulations, or who aids, abets, and encourages another to violate any of its rules or regulations, or who has acted in a manner which brings disrepute upon USA Swimming, or the sport of swimming.

Wielgus Aff., <u>Ex. A</u>., p. 95.

## **Brian Hindson – Coach of Westfield Area Swimmers, Inc. and Central Indiana Aquatics, LLC**

In 1998, Hindson formed the limited liability company named Westfield Area Swimmers,

Inc.  ("WAS") and it was administratively dissolved in 2003.  Brian Hindson Affidavit I ¶ 3, <u>Ex.

1</u>[5], Secretary of State records for Westfield Area Swimmers.  WAS eventually became Central

Indiana Aquatics, LLC ("CIA").  Hindson was the owner and operator of CIA.  Taflinger Dep.

pp. 12:22-25; 28:21-23; 154:13-21.   Hindson formed the limited liability company of CIA in

September  2004.  Hindson Aff. I ¶ 4.  CIA was formed four (4) years <u>after</u> the event alleged in

Plaintiff's Complaint.

---

[5] Brian Hindson first submitted an Affidavit to Thomas E. Wheeler II, attorney for Westfield-Washington School Corp., which is referred to in this Brief as "Hindson Aff. I".  Hindson's second Affidavit dated June 1, 2010 is referred to in this Brief as "Hindson Aff. II".

USA Swimming never hired, employed or supervised Hindson.  *Id.* at ¶ 22.  Hindson was never an employee or agent of USA Swimming.  *Id.* at ¶¶ 30-31.   There is absolutely no evidence that Hindson was ever an employee of USA Swimming.  Taflinger Dep. p. 57:6-15.

As the owner and operater of WAS, Hindson coached Plaintiff in 1999 through August, 2000.  Taflinger Dep. pp. 13:24-25-14:1; 106:20-107:2; Hindson Aff. I ¶ 6.[6]  Hindson controlled the daily activities of his club and swimmers.  Wielgus Aff. ¶ 24.  No one from USA Swimming supervised Hindson's day-to-day activities as a coach while he was running practices.  Taflinger Dep. p. 63:16-19; Hindson Aff. II ¶ 11.  Further, Hindson never expected that a USA Swimming employee would be at every practice and every meet.  Hindson Aff. II ¶ 11.

**Hindson's Unforeseen Criminal Act**

Over seven years after he last coached Plaintiff, Hindson was arrested on February 7, 2008 by federal and local law enforcement.  On March 12, 2008, the Federal Grand Jury for the Southern District of Indiana returned an eight Count Indictment charging him with 3 Counts of Sexual Exploitation of a minor (18 USC 2251 (a) and (e), 4 Counts of Distribution of Child Pornography (18 USC 2252 (a) (2), and 1 Count of Possession of Child Pornography (18 USC 2252 (a) (4) (B) victimizing 11 Jane Does (all minors) named in Indictment.  Ex. 2, Indictment.  Plaintiff, however, was not named as one of the Jane Doe victims.   As a result of the criminal charges, Hindson plead guilty and on October 17, 2008 he was sentenced on all eight counts to 400 months to be served concurrently in federal prison.  Ex. 3, Transcript of Sentencing, pp. 3, 27.  No allegations exist that Hindson ever physically touched any swimmer in a sexual manner.

During the criminal investigation of Hindson, a VHS tape was discovered with a 20 to 30 second video clip of Plaintiff.  Taflinger Dep. p. 130:9-15.  It was determined that the video was

---

[6] While Plaintiff named CIA as a defendant, the events alleged by the Complaint occurred during the time Plaintiff practiced with WAS.

made by Hindson in June 2000 at Westfield High School on one occasion.  Taflinger Dep. pp. 51:9-18; 130:16-22.  At that time, Plaintiff was nearly 19 years old as her birthday is August 27, 1981.  Taflinger Dep. p. 10:11.

To be absolutely clear, USA Swimming was not involved at all in the videotaping of Plaintiff and she does not claim that USA Swimming videotaped her or that USA Swimming instructed Hindson to videotape her.  Taflinger Dep. p. 52:8-14.  Hindson admits that "no one at USA Swimming or Indiana Swimming had any knowledge about him secretly filming any swimmer at Westfield High School, including [Plaintiff]."  Hindson Aff. II ¶ 13.

At Westfield High School, Plaintiff usually changed in the women's locker room but sometimes she changed in the Coach's office/locker room.  Taflinger Dep. p. 57:19-25.  The video was apparently shot through holes in the locker room in the rear of the coach's office immediately prior to Plaintiff coming in to change her clothes.  Taflinger Dep. pp. 164:4-25-165:1-13; Kokomo Police Lieutenant Donald Whitehead Dep. p. 94:10-15; Hindson Aff. I ¶ 10.  The camera was then removed by Hindson after Plaintiff left the office.  Taflinger Dep. p. 164:20-24.  Not every swimmer was allowed to use the Coach's locker room to change or shower.  Taflinger Dep. p. 59:7-10.  Plaintiff was aware of only her and one other swimmer using the coach's locker room.  Taflinger Dep. p. 59:7-15.

### Hindson's Criminal Act of Videotaping Was Not Foreseeable to Anyone

As Plaintiff testified, nobody knew Hindson was doing the videotaping.  Taflinger Dep. pp. 207:25-208:1; Hindson Aff. II ¶ 13.  <u>Q</u>:  And nobody knew he was doing this?  <u>A</u>:  No.  Taflinger Dep. pp. 207:25-208:1.  <u>Q</u>:  And there was nothing that anybody could have done?  <u>A</u>:  No.  Taflinger Dep. p.  208:2-4.

Hindson's secret criminal acts were not foreseeable or known by Plaintiff and she had no reason to suspect him. Plaintiff had no suspicion that Hindson was videotaping her. Taflinger Dep. p. 55:20-23. Before Hindson was arrested, there was never a time that Plaintiff did not feel that she could trust him. Taflinger Dep. p. 93:22-25. Plaintiff never complained to USA Swimming about Hindson doing anything weird at practices and she never filed any complaints against Hindson. Taflinger Dep. p. 56:13-23. Plaintiff had no reason to look for a camera in the Coach's locker room. Taflinger Dep. p. 152:13-15. Plaintiff had no reason to believe she was being videotaped. Taflinger Dep. p. 152:16-18.

If asked, Plaintiff would have stated that there was nothing unusual or weird about Hindson's behavior. Taflinger Dep. p. 174:11-16. Plaintiff did not see anything out of the ordinary that would lead her to believe that Hindson was videotaping her or anyone else. Taflinger Dep. p. 134:1-6.

Plaintiff did not perceive the criminal act and it was not foreseeable nor should it have been anticipated by Westfield School. Taflinger Dep. p. 202:10-21. There is absolutely nothing that Hindson did that gave Plaintiff any inkling that he was videotaping her. Taflinger Dep. p. 206:15-19. There was nothing said by anyone that would have lead Plaintiff to believe he was videotaping. Taflinger Dep. p. 206:21-23.

The first time Plaintiff used the Coach's locker room she did not check for peepholes or if people were looking at her. Taflinger Dep. p. 153:12-16. This was something that did not come to mind. Taflinger Dep. p. 153:17-19. Plaintiff had no reason to believe that Hindson might be doing something like that. Taflinger Dep. p. 153:20-23

Plaintiff herself admits she could not have prevented the videotaping and neither could anyone else. Plaintiff knows that she could not have prevented it. Taflinger Dep. p. 207:5-6.

9

There was nothing that anybody could have done.  Taflinger Dep. p. 208:2-4.  There was nothing that Plaintiff could have done to discover the videotaping or could have done to prevent it. Taflinger Dep. p. 207:15-21.  Plaintiff acknowledges that not even the school who owned the Coaches' Office could have foreseen or prevented Hindson's criminal act.  Taflinger Dep. pp. 165:20-25-166:1-2; 208:2-4.  No one at the Westfield-Washington Schools knew or had reason to believe that Hindson was taping Plaintiff in the Coach's office.  Taflinger Dep. pp. 165:20-166:1-2.

According to Plaintiff and others, upon inspection it would not be readily apparent that Hindson's video equipment was present.  The locker was not modified in any way and it was impossible to see the camera when the locker door was closed and locked.  Taflinger Dep. p. 165:14-19.  When changing in the locker room, Plaintiff never observed the video equipment or saw the camera. Taflinger Dep. p. 175:1-7.  The school did not have actual knowledge that Hindson was taping through the unmodified ventilation holes in the locker.   Taflinger Dep. pp. 180:20-181:1-7.

Other coaches and swimmers did not foresee or suspect Hindson's secret actions either. The other girls that Plaintiff swam with did not have suspicions or think something weird was happening with Hindson.  Taflinger Dep. pp. 55:25-56:7.  No one ever said that Plaintiff should look out for Hindson.  Taflinger Dep. pp. 153:24-154:5.  Coach Stopkotte, who had combined efforts to run meets with his friend Hindson's club at the Fishers Pool, had no reason to expect that Hindson was videotaping female swimmers either clothed or unclothed.  Stopkotte Dep. pp. 53:12-15; 54:20-24.  In general, Stopkotte had no suspicions of Hindson.  Stopkotte Dep. pp. 54:25-55:1.  No parents approached Stopkotte complaining about Hindson doing anything weird in the locker room.  Stopkotte Dep. p. 55:2-6.

At the time of Hindson's arrest, Stopkotte was a friend of Hindson and had no reason to believe that Hindson was committing any criminal act.  Stopkotte Dep. p. 60:18-21.  In fact, Stopkotte was "shocked" after learning about Hindson's arrest.  Stopkotte Dep. pp.  60:22-61:1.  Before Hindson's arrest, it was not foreseeable at all to Stopkotte that Hindson was videotaping Plaintiff.  Stopkotte Dep. p. 61:4-6, 12-17.  Before Hindson's arrest, no parents came to Stopkotte to raise any concerns about Hindson having a camera in the locker room.  Stopkotte Dep. pp. 61:25-62:3.  Additionally, Stopkotte does not know of any reason to believe that anyone at USA Swimming knew that Hindson was secretly photographing Plaintiff.  Stopkotte Dep. p. 62:8-10, 16-17.

Kyle Messmore, Head Girls Swim Coach at Westfield High School, worked side-by-side with Hindson as an Assistant Coach for CIA starting in 2006 and had no idea Hindson had or was videotaping.  Kyle Messmore Dep. pp. 4:15-24; 9:3-4.  Coach Messmore spent a lot of time with Hindson.  Messmore Dep. p. 47:3-5.  Coach Messmore never reported Hindson for taking photographs because he never saw Hindson do, act or say anything to that effect.  Messmore Dep. p. 47:11-25.  Hindson never indicated that he was putting cameras in the locker room or secretly videotaping.  Coach Messmore would have reported him if he did.  Messmore Dep. p. 48:8-17.  Coach Messmore had a good relationship with Hindson and was "surprised" about the whole thing. Messmore Dep. p. 18:4-5.  Coach Messmore never saw Hindson touch a swimmer inappropriately, or observed, or heard that Hindson made sexual innuendos.  Messmore Dep. p. 49:3-11.  Despite all the time Coach Messmore spent with Hindson, "there was no way in [his] mind that it was foreseeable that Brian would ever do anything like this with girls."  Messmore Dep. pp. 48:24-49:2.

Since 1999, USA Swimming has consistently strongly urged the reporting of inappropriate conduct by any of their members.  Wielgus Dep. p.  29:22-24.  USA Swimming has also urged complaints of criminal activity to first and foremost be reported to police authorities.  Wielgus Dep. pp. 32:24-33:1.  USA Swimming had absolutely no knowledge of any inappropriate conduct by Hindson.  Wielgus Dep. pp. 149:10-14; 150:2.  Prior to Hindson's arrest, there was absolutely no information, rumors, concerns or complaints about Hindson filming swimmers.  Wielgus Dep. pp. 219:16-20; 220:4-15.  In fact, the subject of a coach filming or taking pictures was not even on the radar screen at USA Swimming until the last couple of years.  Wielgus Dep. p. 220:10-15.  From 1997 to the time Hindson was caught, there was never a Board of Review filed against any coach for filming swimmers surreptitiously.  Wielgus Dep. p. 220:22-221:2.  Until Hindson's arrest, the filming of swimmers was totally unforeseeable and unanticipated to USA Swimming.  Wielgus Dep. p. 223:9-21.

Like everyone else, prior to Hindson's arrest, USA Swimming had no knowledge that Hindson videotaped Plaintiff.  Prior to Hindson's arrest, USA Swimming did not receive any complaints or concerns from its members or their parents that Hindson or any other coach was videotaping or placing cameras in locker rooms.  Wielgus Aff. ¶ 17.

**Hindson did not Distribute Plaintiff's Image**

Hinson unequivocally states that no photos of Plaintiff were disseminated in any way by him, including the Internet.  Hindson Aff. II ¶ 2.  Other than law enforcement officials, Plaintiff's parents were the only ones who viewed images and those were just pictures of her face.  Taflinger Dep. p. 170:18-21.  In one of the photos, Plaintiff had her swimsuit halfway on.  Taflinger Dep. p. 171:18-20.  Plaintiff has never seen the images of her allegedly taken by Hindson.  Taflinger Dep. p. 192:17-21.  Plaintiff had a sports bra on in the image, her breasts

12

were not exposed and her one-piece bathing suit was at her waist.  Taflinger Dep. pp. 193:21-194:3.

Plaintiff has no evidence that her photo or video was posted on the Internet.  Taflinger Dep. p. 52:5-7.  Plaintiff has searched the Internet to check to see if there are any photos of her and found none.  Taflinger Dep. p. 95:9-15.  Plaintiff has no evidence that her picture was posted by Hindson anywhere.  Taflinger Dep. p. 77:6-9.  No photographs, videotapes or other depictions of Plaintiff were ever disseminated in any way nor have they been viewed by anyone other than Hindson and individuals associated with law enforcement.  Taflinger Dep. p. 166:3-17; Hindson Aff. I ¶ 12.  Plaintiff has no evidence to dispute that Hindson did not disseminate Plaintiff's image or that any pictures of her went anywhere.  Taflinger Dep. pp. 192:22-193:7.

According to law enforcement, no video or pictures of Plaintiff were on any of Hindson's computers.  Whitehead Dep. p. 99:14-18.  Plaintiff's image is on a VHS tape and not on Hindson's computer.   Kokomo Police Detective Jeffrey D. Catt Dep. p. 97:6-10.   No evidence was discovered by law enforcement that images of Plaintiff were disseminated.  Whitehead Dep. p. 101:17-20.

Detective Catt, who assisted with the forensic investigation of Hindson's computer files, had no information that Plaintiff's images were disseminated.  Catt Dep. p. 122:8-17.  According to Detective Catt, there is no indication that the images of Plaintiff were disseminated.  Catt Dep. p. 102:11-15.   There was only one tape containing the image of Plaintiff.   Catt Dep. p. 114:14-19.

**USA Swimming did not Employ or Hire Hindson to Perform Services and
it is Not the "Boss of Clubs"**

USA Swimming never hired or employed Hindson to act as a coach or in any other
capacity.  Wielgus Aff. ¶¶ 22, 30; Hindson Aff. II ¶ 4(a).  USA Swimming is "not the boss of
clubs", it does not hire coaches and it is not the employer of club coaches.  Wielgus Dep. pp.
47:1-11; 48:22-23; 221:8-12.  The clubs are independent businesses and USA Swimming does
not micromanage their businesses.  Wielgus Dep. p. 49:11-17.   Hindson was not considered on
staff for USA Swimming and it never paid him.  Wielgus Dep. pp. 87:12-14; 88:1-2.  With the
exception of the National Team and National Youth Team head coaches, USA Swimming does
not employ any coaches.  Wielgus Dep. pp. 25:24-26:1.  The only coaches USA Swimming pays
is the National Team and National Youth Team coaches.  Wielgus Dep. p. 88:10-12.  "No other
coaches are paid or have been paid by USA Swimming to represent a team."  Wielgus Dep. p.
88:13-14.

USA Swimming did not control or have the right to control any of the details of how
Hindson coached.  Wielgus Aff. ¶ 33; Hindson Aff. II ¶ 4(c).  USA Swimming did not control or
have the right to control Hindson's daily functions as a coach.  Wielgus Aff. ¶ 33.  USA
Swimming did not control or set Hindson's work or practice schedule.  *Id*.  USA Swimming did
not provide Hindson with the facilities he used, swimmers, assistant coaches or tools.  *Id*.
Hindson, not USA Swimming, selected the facility where he coached and the swimmers
practiced.  *Id*.  USA Swimming had no right to discharge Hindson from his employment with
WAS.  Coaches are employees of clubs.  Wielgus Dep. p. 26:1-5.  There was no expectation
between USA Swimming and Hindson that Hindson was an employee of USA Swimming.
Wielgus Aff. ¶ 34.  At all relevant times, Hindson was an employee of WAS or CIA.  Hindson
agrees that USA Swimming never: i) controlled his any club practices, including his; ii)

controlled his work or practice schedule; iii)  scheduled the facility he used for practices;  iv)

controlled swimmers' food and nutrition;  v) conducted random drug testing of swimmers; vi)

owned the pool or locker rooms at Westfield High School; vii)  guaranteed or was responsible

for WAS payments to Westfield High School during 1999-2000; or viii) controlled the Westfield

High School pool or Hindson's practice/meet schedule during 1999-2000.  Hindson Aff. II ¶

4(b), (d)-(j).  Hindson confirms that USA Swimming <u>never</u> hired him, it did not pay him a salary,

he was not an employee, he had no written contract with USA Swimming and there was no

expectation that he was an employee or agent of USA Swimming.  Hindson Aff. II ¶¶ 5, 7-10.

USA Swimming has never "chartered" local swim clubs, such as WAS or CIA.  Wielgus

Aff. ¶ 20.  USA Swimming did not endorse Hindson.  Wielgus Aff. ¶ 21.  Coach members are

hired by individual clubs, not USA Swimming.  Wielgus Aff. ¶ 22.  USA Swimming never took

on the responsibility to supervise or control local clubs or coaches.  Wielgus Aff. ¶ 23.   USA

Swimming never took over or agreed to monitor, supervise or control the day to day activities of

coach members or their practices, including Hindson.  Wielgus Aff. ¶ 24.  USA Swimming never

took over or agreed to evaluate or grade coach members, including Hindson.  Wielgus Aff. ¶ 25.

USA Swimming never took over or agreed to control, inspect or evaluate any pool

facilities, including the Westfield High School pool facilities.  Wielgus Dep. p. 221:3; Wielgus

Aff. ¶ 26.  Similarly, as a coach member of USA Swimming, Stopkotte agrees he did not receive

a 1099 or W-2 and he did not have a written agreement with USA Swimming.  Stopkotte Dep. p.

47:1-14.  Coach Stopkotte confirmed that USA Swimming does not tell him or his club how to

run its practices, it does not dictate how many hours swimmers can practice or the time of

practice, or what swimmers can eat.  Stopkotte Dep. pp. 71:3-10; 71:15-20.  In fact, employees

of USA Swimming do not come to practices of his club.  Stopkotte Dep. pp. 76:24-77:1-2.

**<u>USA Swimming did not Invade Plaintiff's Privacy or Breach a Duty</u>**

Plaintiff does not claim that Hindson or USA Swimming invaded the privacy of her home.  Taflinger Dep. pp. 50:22-51:1-2.  Plaintiff admits Hindson did not physically contact her.  Taflinger Dep. p. 51:3-5.  <u>Plaintiff does not know of any duty breached by USA Swimming</u>.  Taflinger Dep. p. 212:9-21.  Plaintiff admits that no one from USA Swimming invaded her physical space in the rear of a Coaches office at Westfield High School.  Taflinger Dep. p. 215:21-24.

**<u>USA Swimming's Expulsion of Hindson</u>**

On February 13, 2008, USA Swimming initiated emergency proceedings under its National Board of Review procedure against Hindson.  Wielgus Aff., <u>Ex. B</u>, Emergency Suspension Order.  On that same day, the National Board of Review suspended Hindson from membership (in any capacity) in USA Swimming pending a final hearing on April 3, 2008 under the USA Swimming Rules and Regulations.  *Id.*  On April 3, 2008, Hindson was expelled, effective immediately, and permanently banned from membership (in any capacity) in USA Swimming.  Wielgus Aff., <u>Ex. C</u>, Permanent Expulsion Order.

**II.     <u>SUMMARY JUDGMENT STANDARD</u>**

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions on file, together with any affidavits, show there is no genuine issue of material fact and the movant is entitled to Summary Judgment as a matter of law.  *Delta Consulting Group, Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009) <u>citing</u> Fed. R. Civ. P. 56(c).  "The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party."  *Id.*  "A genuine issue of material fact exists only if sufficient

evidence favoring the non-party exists to permit a jury to return a verdict for that party". *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007).

"In determining whether a genuine issue of material fact exists, all facts are construed in favor of the non-moving party, but [the Court's] favor towards the non-moving party does not relieve it of the obligation to do more than simply show that there is some metaphysical doubt as to the material facts." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).  Also, the favor towards the non-moving party "does not extend to trying inferences that are supported by only speculation or a conjecture." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010)(citations omitted).  "Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors …" *Rand v. CF Indus., Inc.,* 42 F.3d 1139, 1146 (7th Cir. 1994) quoting *Visser v. Packer Eng'g Assocs., Inc.,* 924 F.2d 655, 659 (7th Cir. 1991).

"As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure a just, speedy, and inexpensive determination of every action." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1103 (7th Cir. 2008)(citations omitted).

"Summary judgment is the 'put up or shut up' moment in a lawsuit." *Id.* citing *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).  "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleading but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* citing Fed. R. Civ. P. 56(e).  "When the party moving has met the standard of Rule 56, summary judgment is mandatory." *Id.* (citations omitted).  "The mere existence of factual dispute, by itself, is not sufficient to bar summary judgment." *Id.* "Only factual disputes that might affect the outcome of the suit in light of the substantive law

will preclude summary judgment." *Id.* (citations omitted). "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Id.* (citations omitted).

"To survive summary judgment, the non-moving party must present evidence sufficient to establish a triable issue of fact on all essential elements of the case." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009)(citations omitted). "If there is no triable issue of fact on even one essential element of the non-moving party's case, summary judgment is appropriate." *Id.*

A federal court sitting in diversity jurisdiction shall apply federal procedural laws, but it must apply the substantive laws of the state in which it sits. *Digitech Computer, Inc. v. Trans-Care, Inc.*, 583 F.Supp.2d 984, 990 (S.D. Ind. 2008) citing *First Nat. Bank And Trust Corp. v. American Eurocopter Corp.*, 378 F.3d 682, 689 (7th Cir. 2004). "Federal courts sitting in diversity ought to be circumspect in expanding the law of a state beyond the boundaries established in the jurisprudence of the state." *King v. Damiron Corp.*, 113 F.3d 93, 97 (7th Cir. 1997) citing *Dausch v. Rykse,* 52 F.3d 1425, 1438 (7th Cir. 1994). Indeed, the Seventh Circuit has held that "plaintiffs must come forward with *some* authority to support their view that they have a right to the relief they seek because, as we have stated, we have 'limited discretion ... with respect to untested legal theories brought under the rubric of state law.'" *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 635-36 (7th Cir. 2007) quoting *A.W. Huss Co. v. Cont'l Cas. Co.,* 735 F.2d 246, 253 (7th Cir. 1984). "Without state authority to guide [the Court], '[w]hen given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability, [the Court] should choose the narrower and more reasonable path (at least until the [state] Supreme Court tells us differently).'" *Id*. quoting *Todd v. Societe Bic, S.A.,* 21 F.3d 1402, 1412 (7th Cir. 1994) (en banc); see also *Insola v. Philip Morris Inc.,* 216 F.3d 596,

607 (7th Cir. 2000) ("Federal courts are loathe to fiddle around with state law. Though district courts may try to determine how the state courts would rule on an unclear area of state law, district courts are encouraged to dismiss actions based on novel state law claims.").

### III.   LEGAL ARGUMENT

#### A.   Plaintiff's Invasion of Privacy Claims Against USA Swimming Fail as a Matter of Law.

##### 1.   Indiana Does Not Recognize Plaintiff's Count 9 for Public Disclosure of Private Facts.

Count 9 of the Complaint is for Invasion of Privacy by public disclosure of private facts. Two Indiana Federal Courts have held that Indiana law does not recognize public disclosure of a private fact as a subcategory of invasion of privacy.  See, *Clark v. Nationwide Credit, Inc.*, 2008 WL 4601582, *1 (S.D. Ind. Oct. 16, 2008); *Brown v. Wabash Nat'l Corp.*, 293 F. Supp.2d 903 (N.D. Ind. 2003).   In *Clark*, the Court dismissed a count for invasion of privacy by public disclosure of private facts.  Referring to the Indiana Supreme Court's decision in *Doe v. Methodist Hospital*, 690 N.E.2d 681, 692-93 (Ind. 1997), the *Clark* Court ruled that "the public disclosure of private facts is no longer a viable tort in Indiana."  *Id*. at *2.  As a result, dismissal of Count 9 is proper because Indiana does not recognize a claim for public disclosure of a private fact and, thus, Plaintiff has failed to state a claim upon which relief may be granted.

Alternatively and assuming *arguendo* that Indiana may still recognize such a claim, Plaintiff cannot show and there is a total absence of evidence that USA Swimming gave publicity or communicated a private fact concerning the Plaintiff.   The "[p]ublic disclosure of private facts occurs when a person gives 'publicity' to a matter that concerns the 'private life' of another, a matter that would be 'highly offensive' to a reasonably person and that is not of legitimate public concern."  *Vargas v. Shepherd*, 903 N.E.2d 1026, 1031 (Ind. Ct. App. 2009)

(citations omitted).   Furthermore, "a communication to a single person or to a small group of persons in not actionable because the publicity element requires communication to the public at large or to so many persons that the matter is substantially certain to become one of public knowledge." *Id*.

The evidence demonstrates that USA Swimming did not publicize, disclose or communicate any private facts about Plaintiff.  Furthermore, the undisputed facts demonstrate that the videotape was not on Hindson's computer and it was never disseminated by Hindson, let alone USA Swimming.  Taflinger p. 52:8-14.  Plaintiff admits that USA Swimming did not videotape her or instruct Hindson to do so.  Consequently, because no evidence exists that USA Swimming invaded Plaintiff's privacy or that the image of Plaintiff was disseminated, Summary Judgment for USA Swimming is appropriate.

### 2. Plaintiff's Count 10 for Invasion of Privacy by Intrusion Upon Seclusion Fails Because No Evidence Exists that USA Swimming Committed Any Outward Act to Invade Plaintiff's Privacy.

"Indiana courts have narrowly construed the tort of invasion of privacy by intrusion." *Mills v. Kimbley*, 909 N.E.2d 1068 (Ind. Ct. App. 2009)(citations omitted).  "To establish a claim for invasion of privacy by intrusion, a plaintiff must demonstrate that there was an 'intrusion upon the plaintiff's physical solitude or seclusion as by invading his home or conducting an illegal search.'" *Id*.

According to the Indiana Supreme Court, "the tort of invasion of privacy requires intrusion into the plaintiff's private 'physical' space." *Id*.  The District Court for the Northern District of Indiana recently wrote, "there have been no cases in Indiana in which a claim for intrusion was proven without physical contact or invasion of the plaintiff's physical space such as the plaintiff's home." *Rhoades v. Penn-Harris-Madison School Corp.*, 574 F.Supp.2d 888

20

(N.D. Ind. 2008).  Similarly, the Indiana Court of Appeals as of 2008 confirmed that no cases exist "in which a claim of intrusion was proven without physical contact or invasion of a physical space such as the plaintiff's home."  *Newman v. Jewish Community Center Assn. of Indianapolis, Inc.*, 875 N.E.2d 729, 736 (Ind. Ct. App. 2008).

Additionally, the Court in *Rhoades* noted that "it is not the prerogative of federal courts to expand state tort law beyond the limits that state courts have indicated to be desirable." *Rhoades*, at 908. The *Rhoades* Court held that "because there is no physical invasion of privacy in this case, and because of the Indiana state courts' lengthy practice of requiring that element to exist, this court will not expand the tort or invasion of privacy beyond that limitation." *Id.*

While the Court initially denied USA Swimming's Motion to Dismiss Counts 9 and 10 using a procedurally different standard,  it is presently ever more clear, even after 12 depositions, that there is absolutely <u>no</u> evidence or material fact showing that USA Swimming acted or failed to act in any way to physically invade Plaintiff's home or physical space.  Absolutely no evidence exists that USA Swimming videotaped Plaintiff, that it directed her to be videotaped, that it had any involvement in videotaping her, or that it even had any knowledge of Hindson's criminal act of videotaping Plaintiff.  Plaintiff admits that USA Swimming did not invade her personal space or instruct Hindson to videotape her.  Taflinger Dep. pp. 50:22-51:5; 215:21-24. Plaintiff cannot meet her evidentiary burden against USA Swimming on her invasion of privacy claim and, therefore, Summary Judgment in favor of USA Swimming should be granted.

**B.** **Summary Judgment is Appropriate on Plaintiff's Negligent Supervision Claim Because USA Swimming did Not Hire Hindson to Perform Any Services, it was Not Hindson's Employer and it is not a Boss of the Clubs.**

In Count 11 of her Complaint, Plaintiff brings a claim of Negligent Supervision against USA Swimming. Indiana recognizes a claim for negligent supervision in only one instance and imposes "liability on an <u>employer</u> when an <u>employee</u> 'steps beyond the recognized scope of his [or her] employment committed tortious injury upon a third party.'" *Scott v. Retz*, 916 N.E.2d 252, 257 (Ind. Ct. App. 2009)(emphasis added). Further, negligent supervision is a "distinct tort from respondeat superior." *Id.*

Under Indiana law, "a servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct and the performance of the services is subject to the other's control or right to control." *Mortgage Consultants, Inc. v. Mahaney*, 655 N.E.2d 493, 495 (Ind. 1995) <u>quoting</u> *Restatement (Second) of Agency* §220 (1958). Accordingly, one who is not hired in the first instance is neither an independent contractor nor an employee and falls outside the conventional master-servant relationship as understood by the common law agency doctrine. Stated differently, in order to bring a claim for negligent supervision it must be shown that a master-servant relationship existed in the first place. Plaintiff's negligent supervision claim fails because USA Swimming and Hindson were not in a master-servant relationship. USA Swimming never hired Hindson to perform any services.

The uncontroverted facts confirm that Hindson was <u>never</u> an employee of USA Swimming. USA Swimming is "not the boss of clubs", it does not hire coaches and it is not the employer of clubs. Wielgus Dep. pp. 41:9-16; 45:10-11; 48:22-23; 221:8-12. Furthermore, according to the undisputed facts, USA Swimming <u>never</u> hired Hindson to perform any services for it. The evidence reflects that USA Swimming did not pay Hindson, no tax records were

issued to him, it did not control or supervise his daily activities, there was no expectation between USA Swimming and Hindson that he was hired to perform services for USA Swimming, it had no right to control Hindson's daily functions, work or practice schedule, it did not provide Hindson with the facilities he used, assistant coaches or tools, it did not assist or dictate Hindson's coaching methods, it had no right to fire him, and USA Swimming never took over or agreed to monitor, supervise or control Hindson's day to day activities, practices or techniques.

 As such, there is utterly no evidence whatsoever that USA Swimming was Hindson's employer or master under the law.  Consequently, Plaintiff's cannot establish the essential elements of her negligent supervision claim because the uncontested facts show that Hindson was never in the employ of USA Swimming.  Therefore, USA Swimming requests the Court to enter Summary Judgment in its favor on Count 11 of the Complaint.

Even if Plaintiff had the employer-employee analysis available to her, which is wholly unsupported by the evidence in this case, the result would be the same, in that, Hindson's employer would not be liable for his unanticipated criminal act.[7]  The undisputed facts show that Hindson's true employer in 2000, WAS, would <u>not</u> even be liable for his criminal conduct because videotaping swimmers in the locker room is not normally thought of to be within the scope of a swim coach's employment.  "An employee's act is *not* within the scope of employment when it occurs *within an independent course of conduct* not intended by the employee *to serve any purpose of the employer.  Sandage v. Bd. of Commissioners of Vanderburgh County*, 897 N.E.2d 507, 514 (Ind. Ct. App. 2008)(emphasis original) <u>citing</u> *Restatement (Third) of Agency* §§ 2.04, 7.07(1) (2006).

---

[7] Plaintiff rightfully never specifically alleged or claimed the theory of *respondeat superior* against USA Swimming and the material facts do not support a basis for asserting it in any event.

Hindson, as well as any swim coach for that matter, is not explicitly or impliedly authorized to view, watch or monitor swimmers while they change their clothes.  The unforeseen act of secretly videotaping female swimmers changing in locker rooms, is not an extension of any authorized conduct for a swim coach.  Further, such an act is not incidental to, nor sufficiently associated with, the authorized and expected duties attributed to swim coaches.  Clearly, it is not within a swim coach's job responsibility to view, watch or videotape female swimmers in the locker room.  Moreover, there is no evidence that Hindson was authorized by anyone to view or watch female swimmers in the locker room.   Watching or videotaping female swimmers surreptitiously cannot be said to be done to further the interest of WAS or the interest for the employer of any swim coach.  Certainly, Hindson's unforeseen criminal acts did not further any legitimate business interest.

It is additionally clear that Hindson was not motivated with the intent to further his employer's interest, but rather solely and entirely his own personal self-interests.  Thus, no legitimate argument can be made that Hindson's unforeseen criminal conduct was within the scope of his employment as a swim coach for WAS.  Accordingly, there is absolutely no basis to hold USA Swimming liable as a national governing body, when it was **not** Hindson's employer and under the present circumstances his true employer, WAS, would not even be held liable.  Indeed, the evidence unequivocally establishes that the perpetrator, Hindson, was truly motivated by his own self-interests.  For all the foregoing reasons, Summary Judgment should be entered for USA Swimming on Count 11 of the Complaint.

C.   **Plaintiff's Count 14 Fails as a Matter of Law Because No Special Relationship Existed Between USA Swimming and Plaintiff to Serve as a Basis for Imposing a Duty on USA Swimming**

Plaintiff's Count 14 is for "Breach of Duty Based on a Special Relationship of Mutual Benefit Between Plaintiff and US Swimming."[8]  Indiana does not support a claim for "breach of duty based on a special relationship of mutual benefit".  Legal research turns up no results that such a claim has been established under Indiana law.  Without authority from the Indiana Courts establishing such a claim, "[the Court] should choose the narrower and more reasonable path …" to restrict liability rather than expand liability.  *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 635-36 (7th Cir. 2007).  For these reasons alone, Count 14 of Plaintiff's Complaint should be dismissed because there is no legal authority to support such a claim.

Alternatively, Plaintiff has wholly failed to identify a recognized special relationship that she had with USA Swimming that would impose a legal duty on it.  Again, for this reason dismissal is appropriate.  Furthermore, the existence of one of the accepted special relationships under Indiana law is not supported by the undisputed material facts.

"It is well settled that unless a plaintiff shows an affirmative act of misconduct by a defendant, negligence arising from nonfeasance must be premised on a special relationship between the parties."  *Estate of Cummings v. PPG Industries, Inc.*, 651 N.E.2d 305, 309 (Ind. Ct. App. 1995) <u>citing</u> *Lather v. Berg*, 519 N.E.2d 755, 759 (Ind. Ct. App. 1988).  "It is the exclusive province of the court to determine whether the relationship between the parties gives rise to a duty to exercise care."  *Id*. <u>citing</u> *Garliup Const. Co., Inc. v. Foster*, 519 N.E.2d 1224, 1227 (Ind. 1988).  "Indiana courts have shown a great reluctance to require an individual to take affirmative action to control a third party when there is no special relationship between them."

---

[8] Unlike Plaintiff's claims against the other named Defendants, Plaintiff has never asserted nor alleged a claim against USA Swimming for simple negligence.

25

*Id*. citing *Lather*, 519 N.E.2d at 759.   "No Indiana case law specifically defines the term 'special relationship.'"   *Stockberger v. United States*, 225 F.Supp.2d 949, 960 (S.D. Ind. 2002). Indiana courts have found a relationship in the following circumstances:

> innkeepers and patrons; landowners and invitees; supervising adults and children; teachers and students; and nursing home and nursing home patients.  The underlying thread binding these cases together is the level of interaction or dependency between the parties that surpasses what is common or usual.  Under those circumstances the relationship is characterized as "special."

*Id*.  (citation omitted).  The Restatement of Torts identifies limited types of special relationships upon which a duty exists including: parent/child, master/servant, possessor of land, those in charge of persons having dangerous propensities, and those taking a person into custody. *Restatement (Second) of Torts* §§ 316-20 (1965).  Plaintiff does not fit under any one of these categories.  The question presented by Plaintiff is whether being a member of a voluntary association constitutes a special relationship for purposes of creating a common law duty on the part of the association to protect the member from unforeseen criminal acts.  Indeed, no such legal duty has been established under Indiana law.

Even in instances where the law recognizes a special relationship, no duty exists to protect against the criminal acts of third persons.  For example, under Indiana it is well established that "[g]enerally there is no duty on the part of a business owner to protect its patrons against the criminal acts of third persons unless the particular facts make it reasonably foreseeable that the criminal act will occur."  *Baisicker v. Denny's Inc.*, 704 N.E.2d 1077, 1080 (Ind. Ct. App. 1999).   Under these circumstances, the Court considers whether there was knowledge of the actor's propensity to commit criminal acts.  *Id*. Although there is no special relationship here and the Plaintiff and USA Swimming are not in the status of patron and business owner, the legal analysis and public policy considerations from the *Baisicker* opinion

26

are instructive.  In no instance should a voluntary association, similarly situated to USA Swimming, be legally responsible when all of the material evidence demonstrates that nobody, including Plaintiff, fellow coaches, fellow swimmers, and USA Swimming, knew that Hindson would or had a propensity to secretly videotape Plaintiff.

In the instant matter, there was no special relationship between Plaintiff and USA Swimming that would rise to the level of establishing a legal duty of care.  At the time of Hindson's unforeseen criminal conduct in 2000, Plaintiff was one of two hundred eighty-six thousand (286,000) members of USA Swimming.  USA Swimming had no direct contact, control or authority over Hindson's or his swimmers' daily activities.  Plaintiff was nearly nineteen years old at the time of the incident and as an adult she was not in a relationship with USA Swimming akin to a parent-child relationship or even in-line with a school-student relationship.  USA Swimming did not own, lease or control the Westfield High School pool or the coaches' locker room.  Under the circumstances presented to the Court, a special relationship cannot be found to exist.

A finding of no duty based upon a lack of a special relationship coincides with the outcome of at least one other published opinion in Indiana concerning secret videotapes in a locker room.  In *Roe v. North Adams Community School Corp.*, 647 N.E.2d 655 (Ind. Ct. App. 1995), the Indiana Court of Appeals held, as a matter of law, that where a video camera was obviously concealed there was no duty to protect females changing in a locker room because the defendants "had no knowledge of the risk."  *Id*. at 660.  The plaintiff in *Roe* sued the Red Cross and one of its employees after it was discovered that a student had secretly videotaped her during a lifesaving course sponsored by the Red Cross.   In this case, there likewise is no evidence that USA Swimming knew of a risk that Hindson would criminally videotape Plaintiff

by concealing a camera in the locker room that was not visibly observed by even the Plaintiff herself.

As previously discussed, Plaintiff cannot point to any decision by an Indiana court wherein the claim of a duty based upon the relationship between a voluntary association and member was recognized.  Therefore, without clear guidance from the Indiana courts, Summary Judgment should be granted for USA Swimming.  *Rhoades v. Penn-Harris-Madison School Corp.*, 574 F.Supp.2d 888, 908 (N.D. Ind. 2008)("it is not the prerogative of federal courts to expand state tort law beyond the limits that state courts have indicated to be desirable.").

### D.   Plaintiff's Claim for Breach of Contract Fails Because No Contract Exists Covering Hindson's Unforeseen and Illegal Videotaping.

Plaintiff's claim for breach of contract, alleged as Count 16, fails as well because Plaintiff has yet to identify the purported contract between her and USA Swimming upon which she relies.  More importantly, no contract existed between Plaintiff and USA Swimming that covered the unforeseen videotaping or criminal acts by swim coaches in locker rooms.

"The essential elements of a breach of contract action are the existence of a contract, the Defendant's breach thereof, and damages."  *Life v. Hulsey*, 829 N.E.2d 87, 90 (Ind. Ct. App. 2005) (citation omitted).  "The intention of the party to a contract is to be determined from the four corners of the document."  *Ruff v. Charter Behavioral Health System of Northwest Indiana, Inc.*, 699 N.E.2d 1171, 1174 (Ind. Ct. App. 1998) citing *McCae Management Corp. v. Merchants Nat'l Bank & Trust Co. of Indianapolis*, 553 N.E.2d 884, 887 (Ind. Ct. App. 1999).

Plaintiff admits that she is unaware of signing any contract with USA Swimming. Taflinger Dep. p. 79:15-20.  Plaintiff's viewpoint is consistent with Hindson and Coach Stopkotte's testimony that they do not know of a written contract between club members and USA Swimming.  Stopkotte Dep. p. 67:24-25-68:1; Hindson Aff. ¶12 .  Plaintiff also testified

that she does not know of any duty owed to her that USA Swimming breached.  Taflinger Dep.

p. 212:9-21.

It is alleged in the Complaint that "[a]s a dues paying member of the organization,

Plaintiff and US Swimming had a contractual relationship."[9]  The Indiana Supreme Court has

made it clear that "[a]bsent fraud, other illegality, or abuse of civil or property rights <u>having their</u>

<u>origin elsewhere</u>, Indiana courts will neither enforce an association's internal rules or second

guess an association's interpretation or application of its rules."  *Indiana High School Athletic*

*Assoc., Inc. v. Reyes*, 694 N.E.2d 249, 256 (Ind. 1997)(emphasis added).   The right of a

voluntary association to adopt its own internal rules and regulations is longstanding:

> A voluntary association may, without discretion and interference by the courts,
> for its government, adopt a constitution, by-laws, rules and regulations, which
> will control as to all questions of discipline, or internal policy and management,
> and its right to interpret and administer the same is as sacred as the right to make
> them.

*Edwards v. Indiana State Teachers Assoc'n*, 749 N.E.2d 1220, 1225 (Ind. Ct. App.

2001)(citation omitted).  It has further been accepted that "[a] member of a voluntary association

'subjects himself as fully and completely to the power of the administration, within legal limits,

as to the power of legislation and prescription.'"  *Id*.  Thus, even if Plaintiff identified USA

Swimming's internal rules as the source of creating some sort of contract, she cannot bring such

a claim to this Court to second-guess USA Swimming's decision to ban Hindson.

As for USA Swimming's response when it learned about Hindson's criminal acts, it is

undisputed that it acted swiftly upon notice and enforced its rules against Hindson.  Hindson was

arrested on February 7, 2008 and within three (3) business days USA Swimming suspended

---

[9] Plaintiff was not a member of USA Swimming after the year 2004 and, therefore, no argument can be advanced
that she had a contract with USA Swimming after the year 2004.  Also, Plaintiff has the burden to show that she had
contractual rights with USA Swimming in the year 2000 that would cover Hindson's unforeseen criminal conduct
when Hindson said he videotaped her.

Hindson's membership in any capacity with USA Swimming.  Then, on April 3, 2008, USA Swimming expelled Hindson forever and permanently banned his membership in any capacity in USA Swimming.

While the Indiana Supreme Court would not have this Court interfere with or second-guess USA Swimming's decision to suspend and then ban Hindson, the undisputed facts prove that USA Swimming fairly enforced its internal membership rules and acted swiftly.  In any event, Plaintiff was no longer a member of USA Swimming after 2004 and, consequently, she would have no rights to make a claim arising out of USA Swimming's interpretation and enforcement of its rules in 2008.  Accordingly, Summary Judgment in favor of USA Swimming is appropriate due to the absence of any contract identified by Plaintiff and, furthermore, because as a matter of law the Court cannot interfere with or second-guess USA Swimming's interpretation or enforcement of the association's rules.

### E.    USA Swimming did not Proximately Cause Plaintiff's Alleged Injuries.

Plaintiff has no evidence that "but for" USA Swimming's alleged acts or inaction she would never have been criminally videotaped by Hindson.  Even if a duty exists (which it does not as a matter of law), the undisputed evidence demonstrates that USA Swimming had no knowledge of any risk that Hindson would criminally videotape Plaintiff.   The mere possibility that any member or coach at any time may commit a criminal act does not establish that such act was reasonably foreseeable or that any alleged conduct on the part of USA Swimming was the proximate cause of Hindson criminally and secretly videotaping Plaintiff.  Otherwise, voluntary associations, like USA Swimming, would be held strictly liable for criminal acts on their members and legally considered an insurer of their members.  This is contrary to Indiana

30

law in most other respects.  Employers, businesses, land owners and schools are not even held to this high of a standard under Indiana law.

Proximate cause is one of the essential elements of Plaintiff's purported claims for negligent supervision and a duty based on special relationship.  *Cowe v. Forum Group, Inc.*, 575 N.E.2d 630, 635 (Ind. 1991).  "An indispensable element of a negligence claim is that the act complained of must be the proximate cause of the plaintiff's injuries."  *Bader v. Johnson*, 732 N.E.2d 1212, 1218 (Ind. 2000)(citation omitted).[10]

Proximate cause is a legal question that can be determined by the Court.  Indiana law provides that "[w]here it is clear the injury was not foreseeable under the circumstances and that imposing liability on the original negligent actor would not be justified, the court may determine proximate cause as a matter of law."  *Zimmerman v. R &S Trucking*, 2006 WL 2346392, *1 (S.D. Ind. Aug. 11, 2006)(citation omitted).  "Although the issue of proximate cause is often determined by the trier of fact, where it is clear that the injury was not foreseeable under the circumstances and that the imposition of liability upon the original negligent actor would not be justified, the determination of proximate cause may be made as a matter of law."  *Id*.  Also, proximate cause "can be a question of law where the facts are undisputed and only a single inference can be drawn from those facts."  *Page v. Speedway SuperAmerica, LLC*, 2007 WL 138884, *3 (N.D. Ind. Apr. 16, 2007).

 "A negligent act is the proximate cause of an injury if the injury is a natural and probable consequence, which in light of the circumstances, should have been foreseen or anticipated."  *Bader*, 732 N.E.2d at 1218 (citations omitted).  "At a minimum, proximate cause requires that the injury would not have occurred <u>but for</u> the defendant's conduct."  *Id*. <u>citing</u>

---

[10] While Plaintiff has asserted no simple negligence claim against USA Swimming, the proximate cause analysis borrowed from negligence cases is instructive here.

*Cowe*, 575 N.E.2d at 635 (emphasis added).  "The 'but for' test presupposes that absent the defendant's conduct, a plaintiff would have been spared suffering the claimed injury."  *Id*.

"Proximate cause in Indiana has two aspects, causation in fact and the scope of liability."  *Page*, 2007 WL 138884, at *3 <u>citing</u> *City of Gary ex. Rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1243 (Ind. 2003).  "If the injury would not have occurred but for the defendant's act or omission, there is causation in fact."  *Id*. (citations omitted).  "If the injury would not have occurred without the defendant's negligent act or omission, there is causation in fact."  *City of Gary ex rel. King*, at 1243-44.  "The second inquiry deals with whether the injury is a natural and probable consequence that under the circumstances should have been foreseen or anticipated."  *Id*. (citations omitted).  "Foreseeability in the context of proximate cause involves evaluating the particular circumstances of an incident after the incident occurs."  *Id*. (citations omitted).   As the Court in *Zimmerman* described, "under Indiana law the proximate cause analysis is more specific.  The analysis of the foreseeability element of proximate cause focuses on the facts of the <u>actual</u> occurrence, rather than the more general analysis that applies when courts decide whether the defendant owed a legal duty to the plaintiff."  *Zimmerman*, WL 2346392 at *5 <u>citing</u> *Goldsberry v. Grubbs*, 672 N.E.2d 475 (Ind. Ct. App. 1996)(emphasis added).

Under Indiana law, "it is well established that where a defendant's negligence merely creates a condition by which the subsequent injury producing acts of another are made possible, the existence of the first condition cannot be the proximate cause of the injuries, but is the remote cause."  *Estate of Cummings v. PPG Industries, Inc.*, 651 N.E.2d 305, 311 (Ind. Ct. App. 1995).

In other aspects of Indiana law where a duty is found to exist, "a duty to anticipate and take steps to protect against a criminal act arises only when it is reasonably foreseeable that a criminal act is likely to occur." *Bradtmiller v. Hughes Properties, Inc.*, 693 N.E.2d 85, 89 (Ind. Ct. App.1998)(citations omitted), see also, *Roe v. North Adams Community School Corp.*, 647 N.E.2d 655, 660 (Ind. Ct. App. 1995)(where a video camera was obviously concealed there was no duty to protect females changing in a locker room because the defendants "had no knowledge of the risk"). "Simply because an action may have some degree of foreseeable consequences does not make it sound public policy to impose a duty on the actor vis-à-vis an injured party." *Bowman ex rel. Bowman v. McNary*, 853 N.E.2d 984, 991 (Ind. Ct. App. 2006)(citation omitted). When considering proximate cause it must be kept in mind that "[t]he policy underlying proximate cause is that we, as a society, only assign legal responsibility to those actors whose acts are closely connected to the resulting injuries, such that imposition of liability is justified." *Zimmerman*, WL 2346392 at *4 (citations omitted).

It cannot be said as a matter of law that USA Swimming had any reason to foresee that Hindson would criminally videotape Plaintiff. There is no evidence at all showing it was foreseeable to USA Swimming that the Plaintiff would be secretly videotaped by Hindson. In fact, nobody knew Hindson was secretly videotaping. Taflinger Dep. pp. 207:25-208:1; Hindson Aff. II ¶13. There were no prior complaints made to USA Swimming about other coaches or Hindson videotaping females in locker rooms. Briand Hindson admits that no one at USA Swimming had any knowledge that he was secretly videotaping Plaintiff. Hindson Aff. II ¶13. No evidence has been presented that the cameras could have visibly been detected. Taflinger Dep. p. 165:14-19. There was nothing unusual or odd about Hindson's behavior. Other coaches and swimmers, including Plaintiff, did not suspect Hindson either. In fact, the

coaches who knew Hindson were "shocked" and "surprised".  Stopkotte Dep.  pp. 60:22-25-61:1; Messmore Dep. p. 18:4-5.  Truly, Plaintiff was not injured as a result of or "but for" the action or inaction by USA Swimming.

It is equally true that no evidence exists that Plaintiff would not have been criminally videotaped had USA Swimming acted differently.  Plaintiff can offer nothing more than conjecture and "what-if" hypotheticals, unsupported by admissible and credible evidence.  In *Page v. Speedway SuperAmerica, LLC*, supra, the District Court for the Northern District of Indiana explained the difference between Indiana's and the federal summary judgment standard.  The Court wrote, "[u]nlike the Indiana standard for summary judgment, in federal practice summary judgment must be granted when the non-movant has failed to establish an essential element of his claim."  *Id*. at * 3.  Commenting on the plaintiff's burden, the Court went on to write:

> At trial Page will have the burden of establishing proximate cause, and therefore, Page must make a sufficient showing on the essential element of proximate cause to prevent judgment as a matter of law. …  Page is required to present evidence creating a reasonable inference, not merely a possibility.
>
> *        *        *
> Page offers no evidence to support his hypothetical claim that if the Speedway clerk would have verbally intervened, George would not have attacked.  For example, Page does not offer any deposition testimony or affidavit by George to support his subjective claim.   Page simply offers nothing other than his subjective belief that George possibly might not have been attacked if he was warned by the Speedway clerk.

*Id*. at *3.  The Court made it clear that a "theory, however theoretically possible, is merely a speculative theory that does not constitute a reasonable inference to survive summary judgment."  *Id*. citing *Avery v. Mapco Gas Products, Inc.*, 18 F.3d 448, 453-54 (7th Cir. 1994).  The Court held that nothing more than speculation to establish proximate cause is insufficient to survive summary judgment.  *Id*. at *4.  Like in *Page*, Plaintiff's supposition that if USA Swimming

would have acted differently then she would not have been videotaped is not the type of evidence necessary for Plaintiff to survive Summary Judgment under federal procedural rules.

For all the foregoing reasons, Plaintiff cannot establish that USA Swimming's alleged acts or inaction proximately caused her to be videotaped by Hindson.  Undoubtedly, Plaintiff cannot pass the "but for" test and show by credible proof that she would have been spared the situation where she was secretly videotaped if USA Swimming would have acted differently. Under the circumstances and evidence before the Court, Summary Judgment on all of Plaintiff's claims with proximate cause as an element is appropriate due to Plaintiff's failure to establish the element of proximate cause.

## IV.   <u>CONCLUSION</u>

USA Swimming requests the Court to enter Summary Judgment and a final judgment pursuant to Fed. R. Civ. P. 54 (b) in its favor because based on the undisputed material facts Plaintiff's purported claims under Counts 9, 10, 11, 14 and 16 fail as a matter of law. Accordingly, Summary Judgment should be entered for USA Swimming on all of Plaintiff's remaining counts against it.

Respectfully submitted,

*/s/ Bernard L. Pylitt*
Bernard L. Pylitt, Attorney No. 5851-49
Kristopher N. Kazmierczak, Attorney No. 19430-49
Katz & Korin, PC
334 North Senate Avenue
Indianapolis, IN  46204
Office: (317)464-1100
Fax: (317)464-1111
Email: bpylitt@katzkorin.com
         kkaz@katzkorin.com

*Attorneys for Defendant United States Swimming, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of June, 2010, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to the following parties by operation of the

Court's electronic filing system.  Parties may access this filing through the Court's system.

| | |
|---|---|
| Jonathan C. Little<br>*Attorney for Plaintiff* | jonlittlelaw@gmail.com |
| James Curran<br>Law Offices of James Curran<br>*Attorney for Plaintiff* | jimcurrantriallaw@yahoo.com |
| Thomas E. Wheeler, II<br>FROST BROWN TODD, LLC<br>*Attorney for Defendant Westfield Washington*<br>*School Corporation* | twheeler@fbtlaw.com |
| Bernard L. Pylitt<br>KATZ & KORIN, PC<br>*Attorney for Defendant United States*<br>*Swimming, Inc.* | bpylitt@katzkorin.com |

I hereby certify that on the 15th day of June, 2010, a copy of the foregoing was mailed,
by first class, United States mail, postage prepaid and properly addressed to the following:

Brian D. Hindson
FCI Marianna Correctional Institution
P.O. Box 7007
Marianna, FL  32447

*/s/ Bernard L. Pylitt*
Bernard L. Pylitt